<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>KOLE AKINOLA<br><br>      Defendant. | Crim. Action No. 11-310 (JLL)<br><br>**OPINION** |

**LINARES,** District Judge.

   This matter comes before the Court by way of Defendant Kole Akinola ("Defendant" or

"Akinola")'s (1) motion to suppress evidence seized from a rental vehicle on April 27, 2011, and

(2) motion to suppress statements made during a telephone conversation on April 27, 2011.  The

Court has considered the submissions made in support of and in opposition to Defendant's

motions, as well as the arguments and evidence presented on the record during the extensive

evidentiary hearing held in connection with these motions.  For the reasons set forth below,

Defendant's motions are DENIED.

## I.      FACTUAL BACKGROUND[1]

   Shortly after 5:00 a.m. on April 27, 2011, Officers Ryan Schwartz and Timothy Faranda

of the Glen Ridge Police Department ("GRPD") stopped a red Chevy Camaro (the "vehicle" or

"Camaro") traveling westbound on Bloomfield Avenue.  (*See* Def. Exs. 21, 29.)  The officers

---

[1] The facts set forth herein are based on the testimony the Court heard during the evidentiary hearing, the evidence
placed on the record, and the parties' written submissions.  The Court accepts the veracity of these facts for the
purpose of deciding Defendant's motions.

stopped the Camaro after having observed it braking abruptly and swerving between lanes. (*See, e.g.,* Tr. 133:2-9, 1.47:4-7, 2.35:13-14, 2.36:8-22.) Based on the officers' observations, they believed that the Camaro's driver, later identified as Akinola, was driving under the influence of alcohol. (*See, e.g.,* Tr. 1.47:19-21, 2.36:23-2.37:3.)

After stopping the Camaro, the officers approached the driver's side window to speak with Defendant. (*See* Gov't Ex. 2 at 5:21:13.) The officers claim to have smelled alcohol emanating from Defendant's breath and from the vehicle. (*See, e.g.,* Tr. 1.54:17-21, 1.55:3-10, 1.58:5-7, 2.38:2-6.) The officers also observed that Defendant had watery droopy eyelids, slurred speech, and was making slow and fumbled hand movements. (*Id.*) When asked to provide his driving credentials, Defendant provided the vehicle's registration and proof of insurance, but failed to provide a driver's license. (*See* Def. Ex. 29; Tr. 2.60:16-17.) A records check subsequently revealed that Defendant's driver's license had expired in 2002 and was not renewed. (*See* Def. Ex. 29.)

Suspecting that Defendant was intoxicated, Officer Faranda asked Defendant to exit the Camaro to perform field sobriety tests. (*See* Tr. 1.59:5-6; Gov't Ex. 2 at 5:23:53-5:24:10.) Officer Faranda administered three field sobriety tests and concluded that Defendant failed two out of the three. (Tr. 1.60:3-10.) After Defendant completed the field sobriety tests, Officer Schwartz placed him under arrest for (1) driving while intoxicated in violation of N.J.S.A. § 39:4-50; (2) careless driving in violation of N.J.S.A. § 39:4-97; (3) failing to maintain a lane in violation of N.J.S.A. § 39:4-88(b); and (4) driving without a license in violation of N.J.S.A. § 39:3-10. (Def. Ex. 29.)

After Defendant was placed under arrest, Officers Schwartz and Faranda made arrangements to impound the Camaro and have it removed from Bloomfield Avenue. Before the

Camaro was removed, Officer Faranda advised Defendant that the Camaro would be impounded and asked him if he wanted to retrieve anything from it. (Gov't Ex. 2 at 5:37:33.) Defendant did not specifically answer Officer Faranda's question, but requested that the officers permit him to call someone to take the vehicle. (Gov't Ex. 2 at 5:37:40.) This request was denied. (Gov't Ex. 2 at 5:37:50.)

Subsequently, Officers Schwartz and Faranda transported Defendant to GRPD headquarters. Sergeant James McCann, who had arrived on the scene shortly after the stop, remained on the scene to wait for the tow company to impound the Camaro. (Tr. 3.32:14-15.) While waiting for the tow company, Sergeant McCann began performing an inventory search of the vehicle. During his search, Sergeant McCann found, among other things, two cellular phones and a set of keys in the passenger compartment. Inside the trunk, Sergeant McCann found an open soft, leather briefcase. (*See* Def. Ex. 31.) According to Sergeant McCann, some of the items of the briefcase had spilled about the trunk. (*See* Def. Ex. 31; Tr. 3.42:7-8, 3.44:25-3.45:5.) These items included several checkbooks; prepaid debit cards in other people's names; multiple pages of white, lined paper with several different names, corresponding social security numbers, and dates of birth; and a doctored W-2 form. (*See* Def. Ex. 31; *see also* Gov't Exs. 7-9.) Based on his training and experience, Sergeant McCann instantaneously recognized the items he found in the trunk as potential evidence of fraud. (Tr. 3.51:13-3.53:13, 3.135:15-23.) Sergeant McCann brought the briefcase and the loose items to headquarters for further investigation. (*See* Def. Ex. 31; Tr. 3.54:11-14.)

At headquarters, Sergeant McCann gave the briefcase and the loose items to Detective Sergeant Dean Gnardellis. (Tr. 3.54:9-14.) Sergeant McCann explained to Detective Sergeant Gnardellis that he had retrieved the briefcase and the loose items while conducting an inventory

search of a vehicle whose driver had been arrested for driving while intoxicated. (*See, e.g.*, Def. Ex. 23.) Detective Sergeant Gnardellis then confirmed with Sergeant McCann that the briefcase was open when he found it. (Tr. 4.15:22-4.16:1-6.) Thereafter, Detective Sergeant Gnardellis inventoried the full contents of the briefcase and the loose items that Sergeant McCann removed from the vehicle. Among the things that Detective Sergeant Gnardellis found inside the briefcase were: (1) Turbo Tax receipts in different individuals' names without attached cards; (2) several cellular phones; (3) five United States Postal Service money orders, each in the amount of $1,000; (4) three New Jersey State income tax refund checks in different people's names; (5) a composition notebook with numerous names and corresponding personal identification information and dollar amounts; (6) multiple pages from a 2007 copy of the Union County Correctional Facility daily population report; and (7) several W-2s. (*See* Gov't Ex. 23.)

At some point after the stop, the officers learned that the Camaro belonged to Avis Car Rental ("Avis"), and was rented to a Mellissa Bailey ("Bailey"), Defendant's girlfriend. (*See* Tr. 3.39:5-15; Bailey Aff. ¶ 1; Akinola Aff. ¶ 8.) Bailey had rented the Camaro for Defendant's use because he did not have a credit card. (*See* Akinola Aff. ¶¶ 9-11.) According to Defendant, he deposited money into Bailey's bank account so that she could use this money to pay the costs incurred in renting the Camaro. (*See id.* ¶ 11; *see also* Bailey Aff. ¶¶ 3-4).

When they arrived at GRPD headquarters, Officers Faranda and Schwartz placed Defendant in a holding cell. (*See* Def. Exs. 21, 29.) Officer Faranda advised Defendant that Sergeant McCann was performing an inventory search of his vehicle and, again, asked him if there was anything he needed. (Tr. 1.66:9-15.) Defendant responded that he needed his "school bag," but that he would "get it later." (*Id.*)

Approximately 20 minutes after Defendant arrived at headquarters, Sergeant McCann administered an Alcotest (i.e., a breathalyzer test) which revealed that Defendant had 0.05% blood-alcohol content. (*See* Def. Br. in Supp. Mot. at Ex. E.) Later, while still in the holding cell, Defendant requested to make a phone call. (*See* Tr. 4.114:15-23.) Officer Charles Roberts of the GRPD then brought a telephone to Defendant. (*See* Tr. 4.114-4.116.) With Officer Roberts' assistance, Defendant placed the call and spoke to an unidentified male in Yoruba, a Nigerian language. (*See* Gov't Ex. 13.) This call was recorded. (*See id.*)

Later that day, Detective Sergeant Gnardellis called Special Agent Eric Malecki of the U.S. Postal Inspection Service, and advised him that GRPD officers discovered items during an inventory search that may warrant further investigation. (*See, e.g.,* Gov't Ex. 23.) On April 28, 2011, Special Agent Malecki filed a complaint charging Defendant with conspiring to defraud the United States and the Internal Revenue Service in violation of 18 U.S.C. § 286. Thereafter, on May 9, 2011, a federal grand jury returned an indictment charging Defendant with conspiracy to defraud the United States and the Internal Revenue Service by obtaining federal income tax refunds based on the submission of materially false federal income tax returns in violation of 18 U.S.C. § 286.

Defendant then filed a motion to suppress the evidence seized from the rental vehicle on August 24, 2011, and a motion to suppress the statements made during the telephone conversation on December 10, 2011. The Court held an evidentiary hearing in connection with Defendant's motions that took place over the course of six days. Following the evidentiary

hearing, the Court allowed the parties to file post-hearing submissions,[2] and heard oral argument on January 25, 2013.

## II.    LEGAL STANDARD

The Fourth Amendment to the U.S. Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. To prevail on a motion to suppress, a defendant generally bears the burden of proving that the challenged search or seizure was unreasonable under the Fourth Amendment. *See United States v. Acosta*, 965 F.2d 1248, 1257 n.9 (3d Cir. 1992) ("The proponent of a motion to suppress has the burden of establishing that his Fourth Amendment rights were violated."). However, when a search is conducted without a warrant, as is the case here, the burden shifts to the Government to demonstrate by a preponderance of the evidence that the warrantless search did not run afoul of the Fourth Amendment. *See, e.g., United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995).

## III.   DISCUSSION

In deciding whether the search of the Camaro and the seizure of evidence therefrom violated Defendant's Fourth Amendment rights, the Court must consider the following: (1) whether the officers had a reasonable suspicion that Defendant had violated any traffic laws prior to stopping him; (2) whether the officers had probable cause to arrest Defendant; (3) whether Defendant has standing to challenge the search of the vehicle and briefcase; and (4) whether, assuming that Defendant has standing to challenge the search of the vehicle and the briefcase,

---

[2] On February 6, 2013, Defendant filed a request for permission to file a supplemental memorandum to respond to certain arguments the Government raised during the oral argument held on January 25, 2013. On this same date, the Court granted Defendant's request, allowing him to file his supplemental memorandum no later than February 8, 2013. Defendant filed his supplemental memorandum on February 15, 2013, a week after the deadline this Court imposed. In spite of his failure to comply with the Court's deadline, the Court has reviewed and considered the points raised in Defendant's supplemental memorandum.

that search was properly conducted in accordance with the GRPD's impoundment and inventory procedures.

Additionally, in deciding whether to suppress Defendant's statements during the April 27, 2011 telephone call, the Court must determine whether Defendant had a reasonable expectation that this conversation would remain private.

The Court will now address the merits of each of Defendant's motions.

## A.    Evidence Seized from the Camaro

### 1.    The Traffic Stop

Traffic stops based on an officer's "reasonable, articulable suspicion that criminal activity is afoot" do not run afoul of the Fourth Amendment. *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio*, 329 U.S. 1, 30 (1968)). "[A] traffic stop will be deemed a reasonable 'seizure' when an objective review of the facts shows that an officer possessed specific, articulable facts that an individual was violating a traffic law at the time of the stop." *United States v. Delfin-Colina*, 464 F.3d 392, 398 (3d Cir. 2006). A "[r]easonable, articulable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Id.* at 396. "Courts give considerable deference to police officers' determinations of reasonable suspicion, and the cases are steadily increasing the constitutional latitude of police to pull over vehicles." *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006) (citing cases). In deciding whether a traffic stop was based on a reasonable suspicion, courts "must consider the totality of the circumstances – the whole picture." *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002) (quotation marks and citation omitted).

Based on its review of the video of the traffic stop, (*see* Gov't Ex. 2.), and the credible testimony of Officers Faranda and Schwartz, this Court finds that the traffic stop of the Camaro was based on a reasonable, articulable suspicion.

Officers Faranda and Schwartz both testified that while traveling eastbound on Bloomfield Avenue in Glen Ridge, they witnessed the Camaro traveling westbound swerving between two lanes. (Tr. 1.32:4-1.33:9, 1.37:9-1.38:6, 2.35:11-2.36:19.) The officers then turned around, and began following the Camaro. (Tr. 1.33:10-13, 2:68:17-21.) As they followed the Camaro, the officers observed it cross over a double yellow line. (Tr. 1.48:8-19, 1.49:14, 2.80:7-18, 2.81:11-12.)

The video of the traffic stop largely corroborates the officers' testimony concerning Defendant's erratic driving. (*See* Gov't Ex. 2.) The video shows the Camaro traveling on the left westbound lane of Bloomfield Avenue, braking abruptly, (*see* Gov't Ex. 2 at 5:19:30), and swerving left onto the double yellow lines separating the east and westbound lanes of Bloomfield Avenue. (*See* Gov't Ex. 2 at 5:19:25-33.) Although the video does not clearly show the Camaro crossing the double yellow lines, it does show the Camaro gradually veering far to the left of the double white lines separating the two westbound lanes of Bloomfield Avenue. (*See* Gov't Ex. 2 at 5:17-35.) In light of the distance between the Camaro and the double white lines on its right, it is apparent to the Court that the Camaro must have crossed over the double yellow lines, as Officers Faranda and Schwartz both testified. (*See, e.g.,* Tr. 1.48:8-19, 1.49:14, 2.80:7-18, 2.81:11-12.)

Indeed, the observations of Officers Faranda and Schwartz provided a reasonable and articulable suspicion that Defendant was driving carelessly and under the influence of alcohol in violation of N.J.S.A. §§ 39:4-50, 39:4-97. *See, e.g., State v. Pavao*, 239 N.J. Super. 206, 209

(App. Div. 1990) ("The erratic nature of the vehicle's movement provided an articulable and reasonable suspicion that defendant was driving carelessly or while under the influence of alcohol.") (citations omitted). Based on the totality of the circumstances, this Court holds that the traffic stop of the Camaro was constitutional.

      2.    <u>Defendant's Arrest</u>

Having determined that the stop of the vehicle was proper under the Fourth Amendment, the Court now turns to consider whether there was probable cause to arrest Defendant.

The Fourth Amendment requires that an arrest be based on probable cause. *See Paff v. Kaltenbach*, 204 F.3d 425, 435 (3d Cir. 2000). "Probable cause to arrest exists when the information within the arresting officer's knowledge at the time of the arrest is sufficient to warrant a reasonable law enforcement officer to believe that an offense has been or is being committed by the person to be arrested." *See id.* at 436. "While probable cause to arrest requires more than mere suspicion, the law recognizes that probable cause determinations have to be made on the spot under pressure and do not require the fine resolution of conflicting evidence required at trial." *United States v. Navedo*, 694 F.3d 463, 467 (3d Cir. 2012) (internal quotation marks and citations omitted). Courts use a totality of the circumstances analysis to determine whether an arrest was properly based on probable cause. *See Maryland v. Pringle*, 540 U.S. 366, 371 (2003).

The crux of Defendant's argument challenging the validity of his arrest is that his performance on the field sobriety tests could not have established probable cause to believe that he was driving while intoxicated because Officer Faranda administered these tests improperly. (*See, e.g.*, Def. Post-Hearing Reply Memo. at 13.) Defendant emphasizes that the officers' probable cause determination is belied by the fact that his Alcotest revealed a 0.05% blood-

alcohol content, which is below the *per se* legal intoxication limit in New Jersey.[3]

Defendant's argument assumes that his performance on the field sobriety tests is the only factor this Court should consider in determining whether there was probable cause for an arrest. Even assuming, *arguendo*, that Officer Faranda failed to administer the field sobriety tests properly, this Court must consider whether there were other factors supporting a finding of probable cause to arrest Defendant.

According to the testimony of Herbert Leckie, Defendant's own expert on the administration of Alcotest and field sobriety tests, field sobriety tests are merely one of the tools that police officers use to determine whether a driver is too intoxicated to drive. (*See* Tr. 6.74:1-22.) Such tests are not "the only tool." (Tr. 6.74:21-22.) Mr. Leckie acknowledged that in deciding whether to arrest someone for driving while intoxicated, a police officer would also consider, among other things, whether he or she smelled alcohol on the driver's breath, the driver's responsiveness to questions, and the driver's behavior. (*See* Tr. 6.74.)

Based on the credible testimony of Officers Faranda and Schwartz, the Court concludes that Defendant's arrest was supported by probable cause and was constitutionally proper. Specifically, as discussed *supra*, both officers observed the Camaro weaving between lanes, and even crossing a double yellow line. (*See, e.g.*, Tr. 1.32:4-1.33:9, 1.37:9-1.38:6, 2.35:11-2.36:19.) When Officer Faranda approached the driver's side window after stopping the Camaro, he smelled "a distinct odor of alcoholic beverage emanating from [Defendant's] breath,"[4] and observed "fumbled hand movements and watery droopy eyelids." (Tr. 1.54:17-20.) He further

---

[3] Under New Jersey law, a driver with a blood-alcohol content of 0.08% or above is considered to be intoxicated as a matter of law. *See* N.J.S.A. § 39:4-50(a).

[4] On the video, Officer Faranda is heard telling Defendant that he was "concerned with [his] driving," could "smell the alcohol," and that Defendant was "not going straight." (Gov't Ex. 2 at 5:23:17-33.)

noted that Defendant was "slightly incoherent during the stop," meaning that he was unresponsive to some of the questions being asked. (Tr. 1.54:20-21, 1.55:3-10.) Officer Schwartz similarly testified that when he first encountered Defendant, he detected an odor of alcohol, and noticed that his "eyelids were slightly droopy" and that his eyes "were bloodshot." (Tr. 2.38:4-6.)

Defendant maintains that the officers' reliance on the field sobriety tests was "not only relevant to the probable cause determination, but [was] the decisive factor." (*See* Def. Supp. Br. at 3.) Defendant argues that Officer Faranda's acknowledgement that he may not have arrested Defendant if he had passed the field sobriety tests demonstrates that the field sobriety tests were dispositive in the officers' probable cause determination. (Tr. 1.127:25-1.129:13.) Defendant further asserts, without providing any citation to the record, that Officer "Faranda reasonably concluded that his observations did not rise [sic] to adequate probable cause without the failed [field sobriety tests]." (Def. Supp. Br. at 3.)

Even if this Court were to find that the field sobriety tests were administered improperly, and that Defendant's performance on these tests tipped the scale in the officers' decision to arrest Defendant, it would not necessarily follow that probable cause was lacking from an objective standpoint. *See Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) ("[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, *when viewed objectively*, justify that action.") (emphasis added); *cf. Whren v. United States*, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."). Indeed, if the officers had concluded that

11

Defendant had passed the field sobriety tests, they may very well have decided not to arrest him *in spite of* the existence of probable cause.[5]

Based on a totality of the circumstances, this Court concludes that the officers had probable cause to arrest Defendant even without considering Defendant's performance on the field sobriety tests. In light of the Court's conclusion, it need not determine whether those tests were properly administered.

3.    Defendant's Standing to Challenge the Search of the Camaro and the Briefcase

Having determined that the stop of the Camaro and Defendant's arrest were constitutionally proper, the Court must now consider whether Defendant has standing to challenge the search of the Camaro and of the briefcase located therein.

"Fourth Amendment standing requires that the individual challenging the search have a reasonable expectation of privacy in the property searched . . . and that he manifest a subjective expectation of privacy in the property searched." *United States v. Kennedy*, 638 F.3d 159, 166 (3d Cir. 2011) (ellipsis in original) (internal quotation marks and citations omitted). That is, Fourth Amendment standing requires a reasonable expectation of privacy from both an objective and subjective standpoint. *See, e.g., Kyllo v. United States*, 533 U.S. 27, 33 (2000) ("[A] Fourth Amendment search does not occur . . . unless the individual manifested a subjective expectation of privacy in the object of the challenged search, and society is willing to recognize that expectation as reasonable.") (internal quotation marks and citation omitted). "[A] reasonable or legitimate expectation of privacy must have a 'source outside of the Fourth Amendment, either

---

[5] The Court notes that even if Defendant had actually been driving sober when he was pulled over, this would not create an absence of probable cause to arrest. *See, e.g., Jones v. Middletown Twp.*, 253 Fed. Appx. 184, 188 (3d Cir. Nov. 8, 2007) ("Because probable cause is a less exacting standard than proof beyond a reasonable doubt, the absence of probable cause is not established by an adjudication of innocence in the criminal proceeding.") (citing *Coleman v. Burnett*, 477 F.2d 1187, 1201-02 (D.C. Cir. 1973)).

by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" *Kennedy*, 638 F.3d at 164 (quoting *Minnesota v. Carter*, 525 U.S. 83, 88 (1998)).

Defendant argues that he had a reasonable expectation of privacy in the Camaro notwithstanding the fact that he was not an authorized driver. In the alternative, Defendant argues that he had a reasonable expectation of privacy in the briefcase. The Court will address each of these arguments in turn.

    a.    <u>Defendant's Standing to Challenge the Search of the Camaro</u>

In *Kennedy*, the Third Circuit addressed one of the very questions before this Court— whether a defendant has standing to challenge the search of a rental car of which he is not an authorized driver. In that case, the defendant's girlfriend rented a car and then lent it to the defendant, who had a valid driver's license. 638 F.3d at 161. The defendant's name was not listed in the rental agreement. *Id.* Acting on an arrest warrant, police officers encountered the defendant while he was walking to the rental car, and placed him under arrest on suspicion of having sold stolen weapons to two minors in exchange for money and drugs. *Id.* One of the officers then contacted the rental car's owner, who requested that the car be impounded. *Id.* Following the car's impoundment, one of the officers conducted an inventory search of the car. *Id.* In the trunk, the officer found a partially open duffle bag containing a disassembled rifle. *Id.* at 162. The officer then stopped the search and spoke to a detective, who subsequently obtained a search warrant to search the rest of the vehicle. *Id.* The detective found a semi-automatic handgun and 202 grams of cocaine base, among other things, inside the vehicle. *Id.* The defendant then moved to suppress the evidence seized from the vehicle. *Id.* at 161.

13

In considering whether the defendant had standing to challenge the search of the rental car, the Third Circuit held that "as a general rule, the driver of a rental car who has been lent the car by the renter, but who is not listed on the rental agreement as an authorized driver, lacks a legitimate expectation of privacy in the car unless there exist extraordinary circumstances suggesting an expectation of privacy." *Id.* at 165. Finding that there were no extraordinary circumstances suggesting an expectation of privacy in the rental car, the court held that the defendant lacked standing to challenge the search of the rental car. *Id.* at 168.

Here, Defendant argues that he has standing to challenge the search of the Camaro even though his name was not on the rental agreement. Specifically, he argues that he had a reasonable expectation of privacy in the Camaro because he was "the *de facto* renter." (*See* Def. Br. in Supp. Mot. at 15-16.) To support this argument, Defendant relies primarily on *United States v. Smith*, a case which the Third Circuit acknowledged "as an example of extraordinary circumstances that might overcome the general rule" that an unauthorized driver lacks standing to challenge the search of a rental car. *See Kennedy*, 638 F.3d at 168 (citing *United States v. Smith*, 263 F.3d 571 (6th Cir. 2001)).

In *Smith*, the Sixth Circuit held that a defendant had a reasonable expectation of privacy in a rental vehicle of which he was the *de facto* renter because he had a business relationship with the rental company in that he reserved the vehicle in his name, paid for it with his own credit card, and had an "intimate relationship with his wife, the authorized user of the vehicle." 263 F.3d at 586-87.

Defendant contends that like the defendant in *Smith*, he was a *de facto* renter because, among other reasons, (1) he had a business relationship with Avis by virtue of his having discussed details of the rental with an Avis agent; (2) he had an "intimate relationship" with the

renter, and deposited funds into the renter's account for the purpose of paying for the rental; (3) he and the renter both understood the vehicle would be for his use; and (4) the renter used the funds that Defendant deposited into her account to pay the credit card fees in connection with the rental. (*See* Def. Br. in Supp. Mot. at 16-17.)

Defendant's reliance on *Smith* is misplaced for three reasons. First, unlike the defendant in that case, Defendant was not a licensed driver. Second, the intimate relationship between the authorized driver and the defendant in *Smith* was much stronger than the relationship between Defendant and Bailey, the authorized renter of the Camaro. In *Smith*, the defendant and the authorized renter were married; here, Defendant and Bailey claim merely to have been dating. Finally, Defendant's claim that he, like the defendant in *Smith*, had a business relationship with the rental dealership is meritless because any such relationship was based on deception.[6] Indeed, both Defendant and Bailey have acknowledged that the Camaro was rented for Defendant's use *ab initio*. (*See* Akinola Aff. ¶ 9; Bailey Aff. ¶ 2.) Yet, they concealed this fact from Avis, presumably, because they did not want to disclose that they intended for an unlicensed driver to drive the Camaro.

The Third Circuit has specifically observed that "an individual who borrows a rental car without the permission or knowledge of the owner not only acts in contravention of the owner's property rights, but also deceives the owner of the vehicle while increasing the risk that the property will be harmed or lost." *Kennedy*, 638 F.3d at 165. As Avis's security manager testified, Avis does not rent its cars with the expectation that unlicensed drivers will drive them. (Tr. 2.24:22-2.25:2.). In driving the Camaro with neither a valid driver's license nor Avis's knowledge and consent, Defendant placed an unbargained-for risk of property harm and loss on

---

[6] It bears mentioning that the defendant in *Smith* paid for the rental car in his own name and with his own credit card. By contrast, in this case Defendant did not directly pay the rental agency for the Camaro.

Avis. Accordingly, he cannot have a reasonable expectation of privacy in the Camaro. *See*

*Kennedy*, 638 F.3d at 167 (holding that unauthorized drivers lack a reasonable expectation of

privacy in a rental vehicle because, among other reasons, their unauthorized use of such vehicles

amounts to "a deceptive means of placing unbargained-for risk of property harm and loss onto

the rental company.").

     As he did not have a reasonable expectation of privacy in the Camaro because he was an

unauthorized driver, Defendant lacks standing to challenge the Camaro's search. *See generally*

*Kennedy*, 638 F.3d at 159-69; *see also United States v. Seeley*, 331 F.3d 471, 472 n.1 (5th Cir.

2003) (per curiam) (holding that rental car driver who was neither the renter nor authorized

driver lacked standing); *United States v. Wellons*, 32 F.3d 117, 119 (4th Cir. 1994) (holding that

unauthorized driver of rental car who had been given permission to drive by authorized driver

lacked standing); *United States v. Roper*, 918 F.2d 885, 887-88 (10th Cir. 1990) (holding that

unauthorized user of rental car lacked standing).

     b.   <u>Defendant's Standing to Challenge the Search of the Briefcase</u>

     Defendant argues that even if he lacks standing to challenge the search of the Camaro, he

had a distinct privacy interest in the briefcase, which he placed in the Camaro's trunk. The

Government, on the other hand, argues that without a reasonable expectation of privacy in the

Camaro, Defendant "could not have had a reasonable expectation of privacy in his briefcase."

(*See* Gov't Opp. Br. at 16.)

     Although the *Kennedy* court did not explicitly state that an individual who lacks standing

to challenge the search of a vehicle also lacks standing to challenge the search of bags or

containers within the vehicle, the Court agrees with the Government that *Kennedy* supports that

very proposition. Defendant's attempt to distinguish *Kennedy* on the basis that the officers in

16

that case obtained a warrant to search the rest of the vehicle upon finding an open bag with a disassembled rifle in the trunk is unavailing for two reasons. First, the fact that the officers in *Kennedy* obtained a warrant played no role in the court's standing analysis. Second, the *Kennedy* court concluded that the defendant lacked a privacy interest in the car, despite the district court's opposite conclusion.[7]

Indeed, in *Kennedy*, the Third Circuit did not make any distinction between one privacy interest with respect to the vehicle, and another with respect to the defendant's bag. Notably, the *Kennedy* court approvingly cited *United States v. Wellons*, a case in which the Fourth Circuit held that "one who can assert no legitimate claim to the car he was driving cannot reasonably assert an expectation of privacy in a bag found in that automobile." *See Wellons*, 32 F.3d at 119 (cited in *Kennedy*, 638 F.3d at 165).

*Wellons* is in accord with a recent unpublished Third Circuit decision, *United States v. White*, No. 11-4035, 2012 U.S. App. LEXIS 23456 (3d Cir. Nov. 15, 2012). In *White*, a defendant challenged a police officer's search of a locked box contained within a stolen vehicle he was driving. The Third Circuit affirmed the district court's denial of the defendant's motion to suppress, and in so doing, observed that "[a] person has no legitimate expectation of privacy in a place where he has no right to be." *White*, 2012 U.S. App. LEXIS 23456, at *8. The *White* court approvingly cited *Wellons* for the specific proposition that "[a] person who cannot assert a legitimate claim to a vehicle cannot reasonably expect that the vehicle is a private repository for his personal effects, whether or not they are enclosed in some sort of a container, [including personal luggage]." *Id.* at *11 (bracketed text in original) (quoting *Wellons*, 32 F.3d at 119).

In light of *Kennedy* and *White*, this Court sees no legal basis to draw a distinction

---

[7] The district court had denied the defendant's motion to suppress on the basis that the search was a valid inventory search. *See Kennedy*, 638 F.3d at 162-63.

between Defendant's privacy interest with respect to the Camaro, and that which he contends exists with respect to the briefcase. Accordingly, because Defendant lacked a reasonable expectation of privacy in the Camaro, he also lacked a reasonable expectation of privacy in the briefcase located therein.

4.     Whether the Search was Properly Performed under the GRPD's Policy

Having concluded that (1) Officers Faranda and Schwartz had a reasonable suspicion to stop the Camaro, (2) probable cause existed to arrest Defendant, and (3) Defendant lacks standing to challenge the search of the Camaro and the briefcase, this Court has valid bases to deny Defendant's motion to suppress the evidence seized from the Camaro without further analysis. Nevertheless, even assuming, *arguendo*, that Defendant has standing to challenge the search, the Court would still deny Defendant's motion because the search was a valid inventory search.

It is well settled that "[w]arrantless searches and seizures are presumptively unreasonable and are therefore prohibited under the Fourth Amendment unless an exception applies." *United States v. Mundy*, 621 F.3d 283, 287 (3d Cir. 2010). "[O]ne exception to the warrant requirement is for inventory searches of lawfully seized automobiles." *Id.* To be lawful, an inventory search "must be conducted according to standardized criteria or established routine, consistent with the purpose of a non-investigative search." *Id.* (quotation marks and citation omitted). Inventory search procedures "serve three 'strong governmental interests': '[1] to protect an owner's property while it is in the custody of the police, [2] to insure against claims of lost, stolen, or vandalized property, and [3] to guard the police from danger.'" *Id.* (quoting *Colorado v. Bertine*, 479 U.S. 367, 372 (1987)). "The criteria or routine must limit an officer's discretion in two ways: first, as to *whether* to search the vehicle, and second, as to the *scope* of an inventory

search." *Id.* at 288 (citation omitted) (emphasis in original). The purpose of these limitations is to ensure that an inventory search is not "turned into a purposeful and general means of discovering evidence of a crime." *United States v. Salmon*, 944 F.2d 1106, 1120 (3d Cir. 1991) (citation and quotation marks omitted).

The GRPD's inventory policy requires that three conditions be satisfied prior to an inventory search: (1) "[t]he vehicle must be properly impounded;" (2) the inventory search cannot serve as a pretext for conducting an investigative search; and (3) "if the owner or permissive user is present, that individual must be given the option of consenting to the inventory search <u>or</u> making arrangements for protecting the property, including the removal of items prior to the inventory search." (Gov't Ex. 3 at III.) The GRPD inventory policy allows for officers to open and inspect "containers found during a consented inventory search." (Gov't Ex. 3 at III.D.)

Defendant argues that the inventory search of the Camaro was unlawful because (1) he was denied the opportunity to make arrangements for someone else to retrieve the Camaro; (2) he never consented to the search, as required by the GRPD's inventory policy; (3) the inventory search was merely a pretext for conducting an investigative search; and (4) the search and seizure of the contents within the briefcase were unreasonable. None of Defendant's arguments is availing.

First, the officers did not have any discretion to allow Defendant to make alternative arrangements to impoundment once they arrested him for driving while intoxicated. Under John's Law, "[w]henever a person has been arrested for a violation of [N.J.S.A. § 39:4-50] . . . the arresting law enforcement agency *shall* impound the vehicle that the person was driving at the time of the arrest." *See* N.J.S.A. § 39:40-50.23 (emphasis added). Although John's Law allows for an impounded vehicle to be released to someone other than the arrestee prior to the

expiration of the statutorily required 12-hour impoundment period, nothing in the statute allows an officer *not* to impound a vehicle after arresting someone for driving while intoxicated. *See* N.J.S.A. §§ 39:40-50.23(b)-(c).

Defendant points out that notwithstanding John's Law, Section III.A of the GRPD inventory policy does not permit impoundment when a driver is placed under arrest unless the vehicle "constitutes a danger to persons, property, or public safety and the driver cannot arrange for someone to remove the vehicle." (*See* Def. Br. in Supp. Mot. at 25.) This language would possibly support Defendant's argument that the officers should have allowed him to make alternative arrangements to impoundment if they had arrested him for something other than driving while intoxicated. However, to interpret the language of the GRPD inventory policy as requiring officers to afford an individual arrested for driving while intoxicated an opportunity to arrange for someone to retrieve the vehicle prior to impoundment is untenable because such an interpretation would require police officers to disregard John's Law. Accordingly, the Court is compelled to conclude that the vehicle was properly impounded pursuant John's Law, and in accordance with Section II of the GRPD inventory policy, which enumerates a *non-exhaustive* list of instances in which an officer may impound a vehicle.[8]

Second, there is no dispute that the officers never obtained Defendant's consent to search the Camaro. Consent, however, is not required under the GRPD inventory policy. What is

---

[8] Section II of the inventory policy enumerates a list of instances that allow an officer to impound a vehicle. Notably, the GRPD inventory policy makes clear that the instances allowing officers to impound a vehicle are "not limited to" those enumerated in Section II. (*See* Gov't Ex. 3 at II.)

required is that the owner or permissive user be given the option of consenting to a search _or_ making arrangements for protecting property within the vehicle.[9]

In this case, Officer Faranda specifically asked Defendant whether he wanted to obtain anything from the Camaro prior to the inventory search. (Tr. 1.61:18-25; Gov't Ex. 2 at 5:37:31-36.) Defendant did not respond to Officer Faranda's question, and instead requested that the officers not impound his car. (Tr. 1.166:7-13; Gov't Ex. 2 at 5:37:31-5:38:32.) As Officer Faranda credibly testified on two separate occasions, Defendant reconfirmed that he did not want to retrieve anything from the Camaro while he was in the cellblock in the police station, stating that he would retrieve a bag from the car "at another date and point in time." (Tr. 1.66:6-15; 5.64:14-22.) Accordingly, the fact that Defendant did not give his consent to the inventory search does not make that search unlawful.[10]

Third, there is nothing in the record to suggest that Sergeant McCann's inventory search was merely a pretext for conducting an investigative search. It would require a leap in logic to infer, as Defendant urges this Court to do, that because Sergeant McCann became aware that Defendant was on probation and suggested to Officer Faranda to contact Defendant's probation officer, Sergeant McCann improperly sought to investigate whether the Camaro contained evidence of other criminal activity. When asked whether he expected to find evidence of

---

[9] For the purpose of its analysis, the Court has assumed that the officers were required to treat Defendant as the Camaro's owner or permissive user, even though he did not have a valid driver's license and was driving the Camaro without Avis's knowledge or consent.

[10] Defendant's reliance on _State v. Mangold_, 82 N.J. 575 (1980) for the proposition that the inventory search was unlawful because the officers never gave him the option of consenting to the search is misplaced. Aside from the fact that this Court is not bound by the New Jersey Supreme Court's decision in _Mangold_, the court in that case held that "a person must be given the option of _either_ consenting to the inventory _or_ making his own arrangements for the safekeeping of the property contained in the vehicle" for an inventory search to be valid. _Mangold_, 82 N.J. at 587 (emphasis added). The officers' actions in this case were in accordance with _Mangold_ because they gave Defendant the option of retrieving his property.

criminal activity prior to conducting the inventory search, Sergeant McCann credibly testified that he did not. (Tr. 3.38:13-16.)

Fourth, notwithstanding Defendant's assertion to the contrary, the Court finds that the briefcase in the trunk was open, and that its contents were strewn about.[11] The search and inventory of the loose items strewn about the trunk were in accordance with the GRPD's inventory policy because Defendant had been given an opportunity to retrieve his belongings from the Camaro, an opportunity which he declined. Moreover, Sergeant McCann's seizure of the loose items scattered throughout the trunk was lawful because these items were in plain view.[12]

It is well settled that an officer may seize evidence that is in plain view without a search warrant if three conditions are satisfied: (1) the officer must have lawfully arrived at the place from where the evidence could be plainly viewed; (2) the incriminating nature of the evidence seized must be immediately apparent; and (3) the officer must have possessed a lawful right of access to the object itself. *See United States v. Stabile*, 633 F.3d 219, 241 (3d Cir. 2011) (citations omitted).

---

[11] Sergeant McCann testified that the briefcase was open when he found it, and that its contents had spilled throughout the trunk. (Tr. 3.41:8-14, 3.42:1-3.) Sergeant McCann's testimony is corroborated by his inventory report, in which he specifically noted that the briefcase was open. (Def. Ex. 31.) Further corroborating the fact that the briefcase was open is Detective Sergeant Gnardellis's testimony that Sergeant McCann informed him that the briefcase was open. (Tr. 4.15:22-4.16:13.) The only evidence in the record suggesting that the briefcase was closed is an affidavit in which Defendant asserts that he "closed the briefcase prior to placing it in the locked trunk." (*See* Def. Mot. in Supp. Ex. B at ¶ 14.) In light of Sergeant McCann's report and the consistent testimony suggesting that the bag was open, the Court will not credit Defendant's conclusory assertion in his affidavit, which was not subject to cross-examination. *See, e.g., United States v. Pascu*, No. 11-10199, 2012 WL 2449905, at *7 n.9 (D. Mass. June 26, 2012) (disregarding defendant's affidavit on a motion to suppress because defendant declined to testify).

[12] It should be noted that the search of the briefcase was also proper under the GRPD inventory policy because the briefcase was open when Sergeant McCann found it. Sergeant McCann and Detective Sergeant Gnardellis both credibly testified that they understood Section III.D as permitting the search of open containers. (*See* Tr. 3.39:25-3.40:9, 3.158:18-23, 4.16:2-4.18:9.) The Court finds that the officers' interpretation of the inventory policy sufficiently limited their discretion in conducting inventory searches. Accordingly, their application of the inventory policy in this case was consistent with governing case law. *See Mundy*, 621 F.3d at 287 (requiring that inventory searches be "conducted according to standardized criteria or established routine").

In this case, Sergeant McCann lawfully accessed the trunk pursuant to the inventory search exception to the Fourth Amendment's warrant requirement. Additionally, Sergeant McCann credibly testified that he immediately understood the fraudulent nature of the loose items in the trunk, which included a doctored W-2 in other people's names and white-lined paper with names, social security numbers, and dollar amounts. (Tr. 3.43:14-23; 3.45:17-20; 3.51:13-53:13.) Finally, Sergeant McCann had a lawful right of access to the loose items seized because he found these items in open view upon lawfully searching the trunk pursuant to the GRPD's inventory policy.

Sergeant McCann's recognition of the incriminating nature of the loose documents he found in the trunk of the Camaro provided probable cause to believe that the briefcase contained evidence of a crime. Indeed, the U.S. Supreme Court has recognized that if law enforcement officers have probable cause to believe if a vehicle or a container within a vehicle contains evidence of a crime, no Fourth Amendment violation occurs if the police open and search the container without a warrant. *See California v. Acevedo*, 500 U.S. 565, 570 (1991) ("[I]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search) (quoting *United States v. Ross*, 456 U.S. 798, 825 (1982)). Based on the incriminating nature of the loose items Sergeant McCann found, Detective Sergeant Gnardellis had probable cause to believe that the briefcase contained evidence of criminal activity. Thus, his search and full inventory of the contents of the briefcase were lawful.

## B.    The Telephone Call

The relevant facts pertaining to Defendant's motion to suppress the statements he made during his telephone call while in the GRPD headquarters holding cell are not in dispute. Officer

Roberts, who was present during the call, acknowledged that he did not tell Defendant that his call would be recorded. (Tr. 4.118:23-25.) Additionally, there were no explicit notices that calls made from the holding cell would be recorded. (Tr. 4.77:10-19.) There were, however, four surveillance cameras and two intercom boxes visible from Defendant's cell when he made the call. (Tr. 4.33:8-4.38:18.)

Defendant argues that the interception of his call from the GRPD holding cell violated both the Fourth Amendment and Title III of the Omnibus Crime Control and Safe Streets Act of 1968, which generally prohibits the interception of "any wire, oral, or electronic communication." *See* 18 U.S.C. § 2511(1)(a). Specifically, Defendant contends that the interception of his phone conversation was unlawful because he did not receive notice that his conversation would be recorded, and did not consent to the recording of his conversation.

The Court will now address the merits of Defendant's Fourth Amendment and Title III arguments.

    a.    <u>Fourth Amendment Argument</u>

In the landmark case of *Katz v. United States*, 389 U.S. 347 (1967), the U.S. Supreme Court recognized that individuals generally have a reasonable expectation of privacy in a telephone conversation, and that such conversations are protected under the Fourth Amendment. As discussed *supra*, a defendant must establish that he had reasonable expectation of privacy from both an objective and subjective standpoint to prevail on a motion to suppress. *See, e.g., Kyllo*, 533 U.S. 334, 338 (2000). An objectively reasonable expectation of privacy "is one that society is prepared to recognize as reasonable." *See Bond v. United States*, 529 U.S. 334, 338 (2000).

Here, Defendant has failed to establish an objectively reasonable expectation of privacy. Courts have consistently held that detainees lack an objectively reasonable expectation of privacy in phone calls made from prisons *or* jails. *See, e.g., United States v. Van Poyck*, 77 F.3d 285, 291 (9th Cir. 1996) (holding that "any expectation of privacy in outbound calls from prison is not objectively reasonable and that the Fourth Amendment is therefore not triggered by the routine taping of such calls."); *United States v. Rushwam*, 275 Fed. Appx. 684, 685 (9th Cir. Apr. 28, 2008) (holding that defendant "had no reasonable expectation of privacy in outbound calls he made from jail"); *Bradley v. Mason*, 833 F. Supp. 2d 763 (N.D. Ohio 2011) ("In this case, society does not acknowledge that a prisoner has a reasonable expectation of privacy in telephone calls made from within the jail to individuals other than his attorney"); *United States v. Harrison*, 986 F. Supp. 280 (M.D. Pa. 1997) ("Courts have been consistent in holding that an inmate does not have an objectively reasonable privacy interest in outbound telephone calls.").

Defendant's suggestion that he had a reasonable expectation of privacy in his phone conversation because he was not specifically warned that the conversation would be recorded is misguided for two reasons. First, the fact that four surveillance cameras and two intercom boxes were visible from his cell was sufficient, from an objective standpoint, to put Defendant on notice that he was being monitored.

Second, as Defendant points out, "many cases have upheld monitoring a prisoner's telephone conversations, (usually *but not always* by relying upon the fact that notice of the monitoring practice had been provided.)." *See* Wayne R. LaFave, 5 SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT (4th ed. 2004) (emphasis added) (citing cases). Notice, however, is not an absolute requirement. *See, e.g., Van Poyck*, 77 F.3d at 291 (recognizing lack of privacy interest in outbound calls from cell as an independent basis for rejecting Fourth

Amendment challenge to recording of call). Rather, the critical inquiry is whether the privacy interest asserted is one that society recognizes as reasonable. As courts have consistently held, society does not recognize as reasonable any expectation of privacy made in phone calls made from a prison or jail cell. *See, e.g., United States v. Howery*, No. 74-567, 1975 U.S. Dist. LEXIS 12552, at \*39. (E.D. Pa. May 2, 1975) (refusing to suppress statements made in a holding cell because a holding cell area is not "protected by a reasonable expectation of privacy."); *see also Van Poyck*, 77 F.3d at 291 ("Even if [defendant] believed that his calls were private, no prisoner should reasonably expect privacy in his outbound telephone calls"); *United States v. Friedman*, 300 F.3d 111, 123 (2d Cir. 2011) ("[W]here a facility provides *some* notice to inmates that calls may be monitored, the facility's 'practice of taping and randomly monitoring telephone calls of inmates in the interest of institutional security is not an unreasonable invasion of the privacy rights of pretrial detainees'") (emphasis added) (citations omitted).

Accordingly, this Court holds that the recording of Defendant's telephone conversation did not violate the Fourth Amendment. In light of the Court's conclusion that Defendant lacked an objectively reasonable expectation of privacy, it need not consider whether Defendant had a subjectively reasonable expectation that his call would remain private, or whether he constructively consented to the recording of his call.

      b.    <u>Title III Argument</u>

According to the Government, Defendant's Title III argument is meritless because two exceptions to Title III's broad prohibition against the interception of communications apply: (1) Defendant's conversation was intercepted "by an investigative law enforcement officer in the ordinary course of his duties," *see* 18 U.S.C. § 2510(5)(a)(ii), and (2) Defendant consented to the interception, *see* 18 U.S.C. § 2511(2)(c).

"To qualify for the law enforcement [exception] under Title III, the interception of an oral communication must not only be conducted by an investigative or law enforcement officer, the interception must also have been conducted in the ordinary course of the officer's duties." *See, e.g., United States v. Clark*, 651 F. Supp. 76, 79 (M.D. Pa. 1986).

In this case, Detective Sergeant Gnardellis credibly testified that *all* calls at the GRPD, including prisoner calls, were recorded, without exception, for liability and customer service reasons. (*See* Tr. 4.32:17-22.) Defendant does not dispute this fact. Nor does he dispute that his telephone conversation was intercepted by an "investigative or law enforcement officer" as defined in Title III.[13]

As Defendant's call was recorded as part of the GRPD's policy to record all incoming and outgoing calls indiscriminately and routinely, it falls within the ordinary course exception to Title III's prohibitions. *See, e.g., United States v. Hammond*, 286 F.3d 189, 192 (4th Cir. 2002) (where law enforcement taped calls as part of established policy, the ordinary course exception exempted the recordings from the prohibitions of Title III); *see also United States v. Morris*, No. 07-20, 2008 WL 5188826, at *4 (W.D. Pa. Dec. 8, 2008) (holding that Title III was not violated where "recordings [took] place in the ordinary course of police duties related to prison security"); *see generally Amati v. City of Woodstock*, 176 F.3d 952 (7th Cir. 1999) (concluding that there is no notice requirement for the "ordinary course" exception" to apply).[14]

---

[13] An "investigative or law enforcement officer" is defined as "any officer of the United States or of a State or political subdivision thereof, who is empowered by law to conduct investigations or to make arrests for offenses enumerated in this chapter, and any attorney authorized by law to prosecute or participate in the prosecution of such offenses." 18 U.S.C. § 2510(7).

[14] In light of its conclusion that the law enforcement exception to Title III's restrictions applies, the Court need not address the Government's implied consent argument.

Because Defendant has failed to establish either a Fourth Amendment or Title III violation with respect to the recording of his telephone call, his motion to suppress statements made during that call is denied.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion to suppress the evidence seized from the Camaro on April 27, 2011, and his motion to suppress the statements made during a telephone conversation on that date are DENIED. An appropriate order follows this opinion.

Date: March ~~12~~ 15, 2013

Jose L. Linares
United States District Judge